No. 14-16948

UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization; EARTH ISLAND INSTITUTE, a non-profit organization; and CALIFORNIA CHAPARRAL INSTITUTE, a non-profit organization,

*Plaintiffs and Appellants*
*vs.*

SUSAN SKALSKI, in her official capacity as Forest Supervisor for the Stanislaus National Forest, and UNITED STATES FOREST SERVICE, an agency of the Department of Agriculture

*Defendants and Appellees,*

*And*

TUOLUMNE COUNTY, et al.,

*Defendant-Intervenors and Appellee-Intervenors*

APPEAL FROM DENIAL OF MOTION FOR PRELIMINARY INJUNCTION
BY THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF CALIFORNIA
Honorable Garland E. Burrell Jr., U.S. District Court Judge

## BRIEF OF APPELLANTS

Rachel M. Fazio (CA #187580)
P.O. Box 897
Big Bear City, CA 92314
(530) 273-9290
rachelmfazio@gmail.com

Justin Augustine (CA #235561)
351 California St., Suite 600
San Francisco, CA 94104
(415) 436-9682
jaugustine@biologicaldiversity.org

## CORPORATE DISCLOSURE STATEMENT
## REQUIRED BY FRAP 26.1

Plaintiff-Appellants Center for Biological Diversity, Earth Island Institute

and California Chaparral Institute have no parent companies, subsidiaries, or

affiliates that have issued shares to the public in the United States or abroad.

s/ Rachel M. Fazio_____
RACHEL M. FAZIO
P.O. Box 897
Big Bear City, CA 92314
Attorney for Plaintiff-Appellants

## <u>TABLE OF CONTENTS</u>

<u>JURISDICTIONAL STATEMENT</u> .................................................................1
<u>STATEMENT OF ISSUES</u> ..........................................................................1
<u>STATEMENT OF FACTS</u> ...........................................................................2
<u>PROCEDURAL HISTORY</u>........................................................................15
<u>SUMMARY OF ARGUMENT</u> ..................................................................17
<u>STANDARD OF REVIEW</u> ........................................................................19
<u>ARGUMENT</u> ...........................................................................................21

I.     THE FOREST SERVICE FAILED TO TAKE A HARD LOOK AT THE IMPACTS OF THE RIM FIRE LOGGING PROJECT ON RESIDENT CALIFORNIA SPOTTED OWLS…………………………………...21

    A.  The Forest Service Improperly Concealed from the Public the 2014 Spotted Owl Survey Data Results in the Rim Fire Area……………21

    B.  The Forest Service Misrepresented Spotted Owl Studies and Consistently Minimized Adverse Impacts of Post-fire Logging on Spotted Owls in an Effort to Avoid a Full and Fair Discussion of the Impacts of the Rim Fire Logging Project on the California Spotted Owl………………………………………………………………..25

    C.  The Forest Service Did Not Provide a Meaningful Explanation to Support their Finding that the Logging of Thousands of Acres of California Spotted Owl Preferred Foraging Habitat within the Core Areas of 39 Occupied California Spotted Owl Territories "May Affect Individuals but Would not Lead to a Trend Towards Listing", and Thus Failed to Take a Hard Look at the Impacts of this Project……30

II.    THE FOREST SERVICE WAS REQUIRED TO PREPARE A SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT TO FULLY CONSIDER THE IMPACTS OF THE RIM FIRE LOGGING PROJECT ON THE CALIFORNIA SPOTTED OWL………………...32

III.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT FAILED TO SUPPLEMENT THE ADMINISTRATIVE RECORD WITH THE DECLARATIONS OF MONICA BOND, DEREK LEE AND DOMINICK DELLASALLA, WHICH, THROUGH THE

DISCUSSION OF COMPLEX AND TECHNICAL MATERIAL
ILLUMINATE RELEVANT FACTORS THAT THE FOREST
SERVICE FAILED TO CONSIDER IN APPROVING THE RIM FIRE
PROJECT…………………………………………………………41

IV.     REMOVAL OF THOUSANDS OF ACRES OF PREFERRED
FORAGING HABITAT FOR THE CALIFORNIA SPOTTED OWL, A
FOREST SERVICE SENSITIVE SPECIES WITH A DECLINING
POPULATION, IN A GEOGRAPHIC LOCATION DESIGNATED AS
AN AREA OF CONCERN FOR THIS SPECIES, WILL LIKELY
RESULT IN IRREPARABLE HARM TO PLAINTIFFS AND THE
ENVIRONMENT, INCLUDING THE 70 OWLS RESIDING IN THIS
AREA…………………………………………………………..47

V.      GIVEN PLAINTIFFS' REQUEST FOR A TAILORED INJUNCTION
WHICH WOULD ALLOW MORE THAN HALF  OF THE
APPROVED LOGGING TO PROCEED, THE BALANCE OF HARMS
AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF
ISSUANCE OF AN INJUNCTION IN THIS CASE………………….50

VI.     NO BOND, OR ONLY A NOMINAL BOND NOT TO EXCEED $1000,
SHOULD BE REQUIRED TO SECURE INJUNCTIVE RELIEF IN
THIS CASE BECAUSE THE EVIDENCE SUBMITTED BY
PLAINTIFFS ESTABLISHES THAT POSTING A SUBSTANTIAL
BOND WOULD CREATE AN UNDUE HARDSHIP, WOULD
THWART THEIR ABILITY TO OBTAIN MEANINGFUL RELIEF IN
THIS CASE, AND WOULD HAVE A CHILLING EFFECT ON THEIR
ABILITY TO ENFORCE ENVIRONMENTAL LAWS IN THE
FUTURE…………………………………………………………54
CONCLUSION .......................................................................................56

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Alliance for the Wild Rockies v. Cottrell*,

    632 F.3d 1127 (9th Cir. 2011)......................................................19

*Amoco Prod. Co. v. Village of Gambell*,

    480 U.S. 531 (1987).....................................................................47

*Asarco, Inc. v. U.S. Envt'l. Protection Agency*,

    1616 F.2d 1153 (9th Cir. 1980).....................................................41

*Blue Mountains Biodiversity Project v. Blackwood*,

    161 F.3d 1208 (9th Cir. 1998).......................................................26

*California ex rel. Imperial County Air Pollution Control Dist. v. United States*

    *DOI*, 767 F.3d 781 (9th Cir. 2014) ...................................................20

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,

    766 F.2d 1319 (9th Cir. 1985) ......................................................55

*Earth Island Inst. v. United States Forest Serv.,*

    442 F.3d 1147 (9th Cir. 2006)....................................21, 22, 31, 32. 50

*Earth Island Inst. v. United States Forest Serv.*,

    351 F.3d 1291 (9th Cir. 2003)...................................................20, 50

*Ecology Center v. Austin*,

    430 F.3d 1057 (9th Cir. 2005) ......................................................31

*Friends of the Earth v. Brinegar*,

    518 F.2d 322 (9th Cir. 1975) .......................................................55

*Habitat Educ. Ctr. v. U.S. Forest Service*,

    607 F.3d 453 (7th Cir. 2010) .......................................................55

*Humane Soc'y of the United States v. Locke*,

    626 F.3d 1040 (9th Cir. 2010) ......................................................20

*Johnson v. Couturier,*

    572 F.3d 1067 (9th Cir. 2009)................................................................54

*League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton,*

    752 F.3d 755 (9th Cir. 2014) ............................................33, 40, 49, 51

*Marsh v. Oregon Natural Res. Council,*

    490 U.S. 360 (1989) ......................................................................36

*Mont. Wilderness Ass'n v. Connell,*

    725 F.3d 988 (9th Cir. 2013) .............................................................30

*National Audubon Society v. United States Forest Service,*

    46 F.3d 1437 (9th Cir. 1993)...........................................................46

*N. Alaska Envtl. Ctr. v. Kempthorne,*

    457 F.3d 969 (9th Cir. 2006)...........................................................40

*Native Ecosystems Counsel v. U.S. Forest Service*

    418 F.3d 953 (9th Cir. 2005)...........................................................21

*Ocean Advocates v. United States Army Corps of Engineers,*

    361 F.3d 846 (9th Cir. 2003)...........................................................21

*Save Our Sonoran, Inc. v. Flowers,*

    408 F.3d 1113 (9th Cir. 2005) ...........................................................55

*Sierra Club v. Bosworth,*

    510 F.3d 1016 (9th Cir. 2007) ...........................................................50

*Sierra Forest Legacy v Rey,*

    577 F.3d 1015 (9th Cir. 2009)...........................................................52

*Warm Springs Dam Task Force v. Gribble,*

    621 F.2d 1017 (9th Cir. 1980)...........................................................36

*Winter v. Natural Res. Def. Council,*

    555 U.S. 7 (2008) .........................................................................19

**<u>Rules</u>**

40 C.F.R. § 1502.9 ................................................................................32

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants Center for Biological Diversity, Earth Island Institute and California Chaparral Institute ("Plaintiffs") appeal the district court's order of October 7, 2014, which denied Plaintiffs' motion for preliminary injunctive relief and Plaintiffs' Motion to Supplement the Administrative Record.  Excerpt of Record, ("ER") at 001-026 (Order).  The district court had jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1346, because this case involves the United States as a Defendant and arises under the laws of the United States.  This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).  Pursuant to Fed. R. App. P. 4(a)(1)(B) Plaintiffs filed a timely notice of appeal on October 8, 2014.  ER.VI at 856-858.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   With respect to the district court's finding that Plaintiffs failed to establish a likelihood of success on the merits of their claims, the issues presented are:

   a.  Did the Forest Service fail to take a hard look at the impacts of the Rim Fire Logging Project when it concealed vital site specific information about severe, undisclosed impacts to a sensitive species into its determination of impacts?

   b.  Did the Forest Service provide a meaningful explanation for their determination that the Rim Fire Salvage Logging Project would affect individual California Spotted Owls (a Forest Service Sensitive Species),

but would not lead to a trend towards listing as endangered/threatened, when it admitted that post-fire logging of high-intensity fire areas harms the owls by removing key foraging/hunting habitat, but then concluded that the logging would not further a trend toward listing ostensibly because the project would focus on removing this very habitat in owl territories?

3.      Did the Forest service violate NEPA when it failed to conduct supplemental environmental analysis as to the 2014 California spotted owl survey data, which strongly contradicted the Forest Service's claims that the Rim fire was too big and intense to support much spotted owl occupancy, and which found that post-fire logging—most of it very extensive—is proposed in every single territory found to be occupied in 2014?

4.      Did the district Court abuse its discretion when it refused to permit supplementation of the administrative record with declarations which included information analyzing the 2014 California Spotted Owl survey data, which was not in the administrative record, and information explaining the complex and technical aspects of spotted owl research done in burned forests—information which, had it been consulted, would have eliminated the clearly erroneous findings of fact upon which the district court's opinion was based?

## STATEMENT OF FACTS

**The Rim Fire:** The Rim fire occurred in the summer of 2013, ultimately spanning 257,314 acres in the western Sierra Nevada, with 154,956 acres burning on the

Stanislaus National Forest with the remainder burning mostly in Yosemite National Park. ER.III at 541; ER.IV at 599. Of the 154,956 acres which burned on the Stanislaus National Forest approximately half of these acres, 75,629, burned in conifer forests made up of pine and fir trees. ER.IV at 599. On the Stanislaus National Forest the Rim Fire was a "classic mixed severity fire" (ER.III at 547), and burned in a mosaic pattern of mixed intensities, with the majority of the conifer forest burning at low intensity (55% ), about 13% of conifer forest burning at moderate intensity, and approximately 32% (or 25,946 acres) of the conifer forest burning at high intensity, wherein most or all trees are killed. ER.IV at 599. These acres of high-intensity fire which burns in mature conifer forest create a rare and very ecologically rich habitat type known as "complex early seral forest", which is characterized by an abundance of standing dead trees (killed by the fire and referred to as "snags"), downed logs, montane chaparral (which are flowering native shrubs), and naturally-regenerating conifer seedlings and saplings. ER.II at 229-244.

On October 30, 2013, a group of approximately 250 scientists from across the nation sent an Open Letter to Members of Congress urging them not to pass legislation that would mandate logging and artificially re-planting in the Rim fire area. ER.II at 89-103. The scientists felt it important to convey to our elected representatives the following:

Though it may seem at first glance that a post-fire landscape is a catastrophe ecologically, numerous scientific studies tell us that even in patches where forest fires burned most intensely the resulting post-fire community is one of the most ecologically important and biodiverse habitat types in western conifer forest. Post-fire conditions serve as a refuge for rare and imperiled wildlife that depend upon the unique habitat features created by intense fire. These include an abundance of standing dead trees or "snags" that provide nesting and foraging habitat for woodpeckers and many other wildlife species, as well as patches of native flowering shrubs that replenish soil nitrogen and attract a diverse bounty of beneficial insects that aid in pollination after fire…This post-fire habitat, known as "complex early seral forest," is quite simply some of the best wildlife habitat in forests and is an essential stage of natural forest processes. Moreover, it is the least protected of all forest habitat types and is often as rare, or rarer, than old-growth forest, due to damaging forest practices encouraged by post-fire logging policies.

ER.II at 89-90.

*California Spotted Owl:*  The California spotted owl is a rare raptor, living mostly in the forests of the Sierra Nevada, and has been designated as a "Sensitive Species" by the U.S. Forest Service, meaning that there is a recognized concern about threats to the owls' viability. ER.III at 548.  Spotted Owls are territorial birds which nest from March 1, 2014 through August 31, 2014. ER.IV at 694. California spotted owls select dense, mature forest stands for nesting/roosting, in either unburned forests or in forests which have experienced low to moderate – intensity fire effects. ER.III at 548;  ER.II at 181.  The Forest Service designates approximately 300-acre areas around these nest/roost locations in spotted owl territories, and calls such 300-acre areas "Protected Activity Centers" (PACs).

ER.IV at 487.  The Forest Service acknowledges, however, that these PACs represent only a small fraction of the 2,500 to 4,700-acre home ranges—*i.e*., the territory areas upon which the owls depend for survival (ER.IV at 684 [*see* Volume 3, Chapter 3, Part 4.4, Page 75]), and stress that "PACs alone are not an adequate conservation strategy for maintaining a viable population of [spotted] owls."  ER.IV at 686 (*see* Volume 3, Chapter 3, Part 4.4, Page 85).

It has recently been determined that California spotted owls are steeply declining in numbers on national forest lands where logging, including post-fire logging, is allowed, and are only maintaining a stable population on the small portion of the Sierra Nevada that is protected from logging (national park lands). ER.II at 267, 274, 277 and 290 (Figure 2).  Declines in California spotted owl populations result when there is a loss of occupancy in owl territories. *Id; see also* ER.IV at 763( ¶11); and ER.IV at 768 (¶6).  For example, when an event like logging causes owls to abandon their territory, this is equated to a loss of those owls because it is likely that displaced owls will not survive due to competition for scarce habitat, potential starvation, and/or death from predation.  ER.IV at 747 (*Bond Dec. ¶5);* ER.IV at 768( ¶ 6). Mixed-intensity wildland fire, however, has *not* been found to cause California spotted owls to abandon their territories, and therefore does not reduce California spotted owl occupancy. ER.II at 254.   In fact, the research demonstrates spotted owl territories generally remain occupied even

when they are affected mostly by high-intensity fire. ER.II at 260 (study showing that even owl territories with over 50% high intensity fire effects remained occupied so long as they were not logged); ER.III at 400-401 (analysis showing that after Rim Fire (but prior to approved logging), 92% of owl territories were occupied); ER.IV at 767( ¶4) (owl pair maintained occupancy in Moonlight fire when territory was burned, but not salvage logged).

However, post-fire salvage logging (logging which takes place after a fire) in spotted owl territories has been found to dramatically reduce or completely eliminate occupancy. ER.II at 262 (seven of eight owl territories were occupied after the fire, but all lost occupancy after salvage logging ); ER.II at 209, 218 and 223; ER.II at 228 (all owl territories in Moonlight fire which were occupied before the fire lost occupancy after territories were salvage-logged); *see also* ER.IV at 767( ¶¶4&5)(nine pairs of owls in Moonlight Fire failed to return to their territories after salvage logging).

Spotted owl research in post-fire landscapes has found that owl territories in such landscapes consist of stark contrasts. While spotted owls have been found to preferentially select dense, mature forest stands with low/moderate-intensity fire effects (or unburned) for nesting/roosting, the owls have also been found to

preferentially select[1], when foraging (*i.e.,* finding food), unlogged, mature conifer forest that has burned at high-intensity which is within a 1.5-kilometer radius of nest/roost locations ER.II at 181), due to the abundant small mammal prey base living in the montane chaparral (native shrubs), downed logs, and snags in the complex early seral forest created by the fire. ER.II at 190; ER.III at 553-554. The vast majority of an owls' foraging activity in high intensity burn areas occurs within this 1.5km radius (1,745 acres) surrounding the owls location, and this area is known as the territory core. ER.II at 186.

Given these developments regarding spotted owls' use of burned forest and the impacts of salvage logging on occupancy, coupled with the conservation concern for this species, scientists who study this relationship have recommended that no post-fire logging should occur within an owl's territory , *i.e.*, within a radius of 2.2 kilometers of an owl's nest/roost location (ER.II at 223), or at the least, that salvage logging should not be conducted within an owl's territory core area, *i.e.*, within 1.5 kilometers (km) of nest/roost locations. ER.II at 187-188.

***Rim Fire Logging Project:*** In December of 2013, just weeks after the Rim Fire finished burning the Forest Service requested, and received approval from the

---

[1] When an animal, such as the California spotted owl, preferentially selects habitat it means that it is seeking out a particular type of habitat for a specific activity. This means that the animal is choosing this habitat over others, indicating high habitat quality for that particular use, regardless of how much of that habitat exists on the landscape ER.II at 50; ER.IV at 753-754( ¶18b).

Council on Environmental Quality to curtail the time required for the analysis and public comment on the Rim Fire Logging Project. ER.II at 28-39. Shortly thereafter the Forest Service issued a Notice of Intent to implement the Rim Fire Recovery Project ("Rim Fire Project" or "Logging Project"). ER.II at 027. Plaintiffs filed timely comments on the proposal. ER.II at 040-67. So too did a group of 150 Scientists, detailing the inconsistencies of the proposal with the fact that: severely burned conifer forest is one of the most biodiverse and wildlife-abundant forest types in the Sierra Nevada; that this habitat type has declined substantially in recent decades due to fire suppression and post-fire logging and replanting; and that there exists a "consensus of scientific opinion that post-fire logging and artificial conifer plantation establishment is one of the most ecologically damaging activities that could occur after mixed-severity fire." ER.II at 77-78.

In accordance with the accelerated timeline the Forest Service issued the Rim Fire Project Draft Environmental Impact Statement on May 16, 2014. ER.II at 109-110. Public comments on the Draft Environmental Impact Statement (DEIS) were due on June 16, 2014 (*Id.*)—months before wildlife surveys, including California spotted owl surveys, would be completed in August of 2014. Plaintiffs submitted timely comments on this proposal. ER.II at 134-171.

The Rim Fire Logging Project decision was signed on August 28, 2014 approving logging on what Defendants characterized as a "fraction" of the Stanislaus National Forest which burned in the Rim fire. ER.IV at 620. However, the approved logging actually represents removal of *most* of the 25,946 acres of complex early seral forest created by high-intensity fire in conifer forest, within the Rim fire on the Stanislaus National Forest (ER.IV at 599), including 15,383 acres of "salvage" logging exclusively in high-intensity fire areas, and 17,335 acres of roadside logging—a significant portion of which is also in complex early seral forest. ER.IV at 613-614.

The Final Environmental Impact Statement (FEIS) for the Rim fire logging project acknowledges that impacts to California spotted owls from post-fire logging of high-intensity fire patches is a "Significant Issue[]" because such logging would "damage" this "important owl habitat". ER.III at 542. The FEIS nonetheless assumed that California spotted owls would not occupy much of the Rim fire area, because the fire was too large and burned too intensely. ER.III at 549.

Surveys conducted by the Forest Service's own wildlife biologists in 2014, prior to logging under the Rim fire logging project, demonstrated that owls were in fact present in the Rim fire area, and to an extraordinary degree. The surveys revealed that:

a. 39 spotted owl territories are occupied (mostly by owl pairs as opposed to single owls) in the Rim fire area (ERIII at 398-400);

b. overall occupancy in the Rim fire, after accounting for probability of detection (*i.e.*, adjusting for the fact that surveyors might not find owls even when they are present), is 92%, which is substantially higher than average annual occupancy in unburned mature/old forest which is typically 60-76% (ER.III at 400-401); and

c. pair occupancy was not reduced in the Rim Fire, even in the territories with mostly high-intensity fire effects. *Id*.

Despite this extremely high owl occupancy revealed by the 2014 surveys, the Rim Fire logging Decision approved logging in <u>all</u> 39 occupied California spotted owl territories, logging that on average would result in the loss of 33% of the overall area within 1.5 kilometers of each owl location, with many territories losing over half of their foraging habitat due to the planned logging. ER.IV at 814-821; *see also* ER.IV at 750-752(¶¶ 15-16). This is important because it has been determined that post-fire logging of a much lower average amount (average of 16%) significantly reduces spotted owl occupancy. ER.II at 205-208.

In 1999, there were 195 California spotted owl territories that had been occupied in one or more previous years on the Stanislaus National Forest. ER.IV at 683(see Table). Spotted owls do not occupy a given territory in every single

year and, as populations have declined since 1999, currently about two-thirds of historical territories are occupied on average in a given year (ER.II at 282 [Figure 1]), such that approximately 120 territories may be occupied on the Stanislaus National Forest in any given year presently.

Impacts from logging to the 39 occupied California spotted owl territories in the Rim fire represent impacts to over one-third of the territories annually occupied by spotted owls on the Stanislaus National Forest. In addition, impacts to spotted owls in the Rim fire area "have a disproportionate potential to affect the California spotted owl population" because the Rim fire area is a designated "Area of Concern" (AOC) for the owls, due to highly fragmented habitat and land ownership, creating "high[]" levels of "risk and uncertainty" with regard to maintaining viable owl populations. ER.IV at 685; *see also* ER.II at 551. The situation on the Stanislaus National Forest is of "particular concern" (*id.*), where only a relatively narrow, fragmented vein of habitat exists to connect the northern and southern portions of the population in the Sierra Nevada, due to a "bottleneck in the distribution of owls on the west slope of the Sierra Nevada", which creates a serious risk of isolating the northern and southern subpopulations and substantially increasing vulnerability and risks to the population's viability. *Id.* In 2001, when the Forest Service believed California spotted owl populations were not declining, the agency concluded that "future problems" would be "greatest",

with regard to adverse impacts to AOCs, like the Rim fire area, if the "owl's status in the Sierra Nevada were to deteriorate." ER.IV at 685. Since then, as discussed above, the owl's status has indeed deteriorated, as its populations are now declining precipitously in the Sierra Nevada where logging—including post-fire logging—is allowed. ER.II at 267, 274, 277, and 290 (Figure 1).

The Forest Service conducted Rim fire spotted owl surveys in 2014, and completed them in early August of this year. ER.III at 395, 398. This information was available to the Forest Service over two weeks before the FEIS and Record of Decision (ROD) were released on August 27th and 28th, respectively. ER.III at 391. On August 21, nine days after Plaintiffs received the survey data, and one week before the FEIS and ROD were released, spotted owl expert Monica Bond submitted a letter to the Forest Service analyzing the 2014 owl survey data and what it meant in relationship to the proposed logging. ER.III at 392, 395-404. The FEIS does not divulge this new owl information (the high level of occupancy or the location of the owls in relation to the planned logging) or analyze the adverse impacts of the removal of thousands of acres of preferred foraging habitat within the primary hunting grounds (*i.e.*, within 1.5 km of owl sites) of these 39 occupied territories.

While the Stanislaus National Forest was in possession of its 2014 California spotted owl survey data in the Rim fire (ER.III at 391), as well as

- 12 -

Monica Bond's expert August 21, 2014 summary and analysis of these data (ER.III at 392), the agency did not report this information to the public in the FEIS.  Instead, the Forest Service claimed in the FEIS that the several published scientific studies finding that spotted owls benefit from patches of high-intensity fire could be disregarded, ostensibly because of the "overall size and severity of the Rim Fire", and because "many owl sites in the Rim Fire had far larger proportions of core areas burned at high severity relative to any of these studies." ER.III at 549.  The Forest Service, in the FEIS, also continued to emphasize that 10 owl territories, which had mostly high-intensity fire effects, "have very low to no probability" of being occupied by the owls, and that occupancy is "uncertain[]" in an additional 9 territories with substantial levels of high-intensity fire.  ER.III at 550.  The Forest Service signed the Rim fire FEIS with these representations and characterizations even though the agency knew that occupancy in the Rim Fire area was 92% (considerably higher than in unburned mature forest), and that 6 out of the 10 territories identified as "very low to no probability" of being occupied were in fact occupied – the owls had merely shifted their nests/roosts after the fire. ER.III at 400-401.

Similarly, in the Rim fire ROD, the Forest Service claimed that one-quarter of the areas where spotted owls nest and roost within the Rim fire perimeter were "destroyed" by the fire.  ER.IV at 610, 622.  The ROD characterized the adverse

- 13 -

effects of the planned logging on spotted owls as "minimal".  ER.IV at 622.  But nowhere did either the Rim fire FEIS or ROD divulge to the public what had been learned from the 2014 surveys – such as the fact that spotted owl occupancy in the Rim fire area is higher than in unburned old forest, or that post-fire logging would impact all 39 occupied owl territories.  As a result, no analysis was done of the effect the logging would likely have on the resident 70 California spotted owls in the Project area.

Meanwhile, the Forest Service acknowledged that California spotted owls use high-intensity fire areas for foraging habitat (ER.III at 553-5554), and in fact "preferentially select" high-intensity fire areas for foraging (ER.II at 117), and concluded that "[p]ost-fire salvage logging may adversely affect rates of owl occupancy" (ER.III at 554) by removing the owl's foraging/hunting habitat.  And then, in the last section of the FEIS on effects to spotted owls, the Forest Service made its final "[d]etermination" about owl impacts, stating that the Rim fire logging project "may affect individuals but is not likely to result in a trend toward Federal listing [under the Endangered Species Act] or loss of viability for the California spotted owl", based on the rationale that the "only areas proposed for salvage [logging] treatments, other than [roadside] hazard removal, are those that burned at high severity…"  ER.III at 563-564.

The number one objective of the Rim fire logging project is to "[c]apture [e]conomic [v]alue through [s]alvage [l]ogging" (ER.III at 541). The Forest Service emphasized its direct financial interest in removing tens of millions of board feet of post-fire timber from the Rim fire, as the agency keeps the revenue from the sale of this public timber to private logging companies. *Id.*; *see also* ER.II at 104-110. The Forest Service also emphasized, in this context, its strong interest in preventing any delay in logging in order to minimize the reduction in timber commodity value from post-fire decay of timber, and maximize financial returns to the agency. *Id.*

## PROCEDURAL HISTORY

On August 28, 20014 the Forest Service signed the Record of Decision for the Rim Fire Logging Project. ER.IV at 641. One week later, on September 4, 2014, Plaintiffs' filed suit. (ER.VI at 684 (Docket Sheet) Dkt. No. 1) On September 12, 2014 Plaintiffs' filed a Motion for Temporary Restraining Order and Preliminary Injunction to enjoin the initial three timber sales (Nevergreen, Triple A and DoubleFork) prepared to implement the Rim Fire Salvage Project. ER.VI at 866, (Dkt. No. 19, 20). Plaintiffs' requested tailored relief which would enjoin logging and logging associated activities within 1.5 km of occupied California spotted owl territories, leaving most of the planned logging within the project area able to proceed unchallenged. ER.VI at 864 (Dkt. No. 1).

The first two challenged timber sales (Nevergreen and Triple A) permit salvage logging operations in the following eight occupied owl territories:

**0027 North Bear Mountain**:    single owl, territory to lose 75% of core habitat through logging. ER.IV at 777, 820.

**040B Mather**:    owl pair, territory to lose 29% of core habitat through logging ER.IV at 776, 818.

**0040 Middle Fork Tuolumne**:    owl pair; territory to lose 37% of core habitat through logging ER.IV at 775, 818.

**0177 Ascension Mountain West**:    owl pair, territory to lose 46% of core habitat through logging .ER.IV at 778, 819.

and

**0039 Ackerson Mountain**:    owl pair, territory to lose 47% of core habitat through logging. ER.IV at 779, 819.

The following owl territories will be subjected to logging pursuant to the Double Fork timber sale:

**0028 Bear Mountain**:    single owl, 71% of core habitat in this territory will be removed through logging ER.IV at 780, 820.

**0025 Middle Fork**:    owl pair; territory to have 58% of core habitat removed through logging.  ER.IV at 781, 820.

and

**0085 Harden Flat NW**:    owl pair, 51% of core habitat will be lost to logging.  ER.IV at782, 819.

All of these Owl Territories are clustered in the same area of the Rim Fire Project. ER.IV at 826; ER.IV at 773.

On September 16, 2014 the District Court denied Plaintiffs' Motion for Temporary Restraining Order. ER.VI at 869 (Dkt. No. 48). On September 17, 2014 logging began on the Nevergreen Timber Sale. On October 7, 2014 the District Court denied Plaintiffs' Motions for Preliminary Injunction and Motion to Supplement the Record. ER.I at 001-026 (Opinion). On October 8, 2014 Plaintiffs filed their Notice of Appeal. ER.VI at 871 (Dkt. 66). On October 17, 2014, logging began on the Triple A timber sale. Sierra Pacific Industries purchased both Nevergreen and Triple A. Logging has not yet begun on the third challenged timber sale (DoubleFork), though it is set to go out to bid again by mid-November. These timber sales are selling public land timber for approximately one or two cents per board foot. ER.VI at 829, 835.

## SUMMARY OF ARGUMENT

The U.S. Forest Service violated NEPA's "hard look" requirement. Defendants, on the one hand, admitted that California spotted owls benefit from the habitat created by high-intensity fire, and are harmed by post-fire logging that removes such habitat. Then Defendants refused to analyze the impacts on resident spotted owls of removing many thousands of acres of this habitat in the Rim fire

area of the Sierra Nevada, inexplicably basing their conclusion that their logging

project—for which the agency admits having a major financial interest—would not

likely pose a risk to owl populations on the argument that the logging would

almost exclusively remove the habitat created by high-intensity fire within spotted

owl territories. This falls far short of satisfying the Ninth Circuit's "meaningful

explanation" standard for Sensitive Species, like the owl, especially as recent data

show an alarmingly rapid population decline. Underscoring Defendants' "hard

look" violation is the fact that Defendants reported to the public, in the Final

Environmental Impact Statement (FEIS) and Record of Decision (ROD), that the

Rim fire is too large and intense to provide good spotted owl habitat, and that

existing science on the benefits of mixed-intensity fire for the owls can be ignored

and logging impacts would be "minimal", while the agency was simultaneously in

possession of 2014 spotted owl survey data from the Rim fire that seriously

contradicted this characterization—survey data and expert analysis that found

*much higher* spotted owl occupancy in the Rim fire than in unburned mature/old

forest, and which found that every single occupied owl territory would be

subjected to post-fire logging—many of them very extensively. This contrary

scientific information also indicated that the Rim fire logging decision would, in a

single project, potentially wipe out as much as one-third of the entire spotted owl

population on the Stanislaus National Forest, and would do so in a designated

spotted owl Area of Concern, where adverse impacts are disproportionately severe for the entire Sierra-wide population. The Forest Service also violated NEPA by refusing to prepare a supplemental environmental impact statement when the agency received this scientific information prior to the issuance of the FEIS and ROD. Moreover, the district court based its ruling for Defendants upon clearly erroneous findings of fact, and misapplications of the law, and the district court improperly denied Plaintiffs' request to supplement the record with declarations from the world's top scientific experts on spotted owls and fire, who provided the court not only with essential explanations of technical material (which would have prevented the court from making clearly erroneous findings of fact, had the court allowed the declarations and been informed by them), but also with key information about relevant factors not considered by the Forest Service.

## STANDARD OF REVIEW

A preliminary injunction is warranted when a moving party can demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. NRDC*, 129 S. Ct. 365, 374 (2008). In addition, a preliminary injunction can be based upon "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff" where plaintiffs also meet the other two elements of the *Winter* test" (*i.e.,*

the public interest favors an injunction and plaintiffs have shown a likelihood of irreparable harm).  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2010).

A district court's denial of Plaintiffs' motion for preliminary injunction is reviewed for an abuse of discretion. *Earth Island Institute v. U.S. Forest Service,* ("*Earth Island I*"), 351 F.3d 1291, 1298 (9th Cir. 2003).  So to is a district court's decision to exclude extra-record evidence. *Humane Soc'y of the United States v. Locke*, 626 F.3d 1040 (9th Cir. 2010).

The district court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of facts."  *Earth Island I*, 351 F.3d at 1298, *quoting Rucker v. Davis*, 237 F.3d 1113, 1118 (9th Cir. 2001)).  The Court reviews findings of fact for clear error and conclusions of law de novo.  *Earth Island Institute v. United States Forest Service*, ("*Earth Island II*"), 442 F.3d 1147, 1156 (9th Cir. 2006), *citations omitted*.

Plaintiffs' claim that Defendants did not take a 'hard look' at the impacts of the Rim Fire Logging Project on the California spotted owl is reviewed de novo. *California ex rel. Imperial County Air Pollution Control Dist. v. United States DOI*, 767 F.3d 781 (9th Cir. 2014).

Plaintiffs' claim that Defendants were required to prepare a supplemental environmental impact statement pursuant to 40 C.F.R. §1502.9(c) is also reviewed de novo. *Id.*

## ARGUMENT

## I. THE FOREST SERVICE FAILED TO TAKE A HARD LOOK AT THE IMPACTS OF THE RIM FIRE LOGGING PROJECT ON RESIDENT CALIFORNIA SPOTTED OWLS

NEPA establishes procedural requirements to ensure that agencies take a "hard look" at the environmental impacts of their actions. *See Ocean Advocates*, 361 F.3d at 1125. Agencies must consider all foreseeable direct, indirect, and cumulative impacts and include a candid discussion of adverse impacts – one that does not improperly minimize negative side effects. *Earth Island Inst. v. U.S. Forest Service,* 442 F.3d 1147, 1154, 1159 (9th Cir. 2006) ("*Earth Island II"*) (citations omitted). In reviewing the adequacy of an EIS or EA, the Ninth Circuit applies the "rule of reason" standard, "which requires 'a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.'" *Native Ecosystem Counsel v. U.S. Forest Service*, 418 F.3d 953, 960 (9th Cir. 2005).

**A.** **The Forest Service Improperly Concealed from the Public the //**
**2014 Spotted Owl Survey Data Results in the Rim Fire Area**

As discussed, *supra*, in the Statement of Facts section, the Rim fire logging
project would remove thousands of acres of California spotted owl foraging
(hunting) habitat from 39 occupied spotted owl territory core areas (a 1.5 kilometer
radius around nest/roost/detection sites)—which comprise over 30% of all
occupied owl territories on the entire Stanislaus National Forest—and would do so
in a designated Area of Concern (where adverse impacts are disproportionately
severe), all while this Sensitive Species is precipitously declining in its Sierra
Nevada range. Given the Forest Service's acknowledgments that high-intensity
burn areas provide suitable foraging habitat for spotted owls and that logging these
areas will negatively impact the owls, one would think that this is exactly the type
of information relevant to a full consideration of direct impacts that would be
discussed in their EIS. Yet nowhere in Defendants' FEIS or ROD is this
information conveyed to the public and there is no analysis of the direct effects that
would occur from logging these thousands of acres of preferred foraging habitat in
occupied owl territory core areas. This is not the type of "full and fair discussion"
allowing for "informed public participation and informed decision-making" which
is required by NEPA. *Earth Island Inst.II*, 442 F.3d 1147 at 1173.

The District Court attempts to evade this glaring omission in three ways, but when it is all said and done two facts remain: this information was not disclosed to the public and was not analyzed in conjunction with the direct effects of the Project on the California spotted owl.

First, the district court ruled that, the Forest Service did not violate NEPA's hard look standard ostensibly because the Forest Service did not receive the August 21, 2014 letter from spotted owl expert Monica Bond, which provided a detailed analysis of the 2014 owl survey data, "until August 27, 2014, 'after the FEIS had been completed and the Forest Service had issued a Proposed Record of Decision,'" which, the court found, "is why the FEIS does not address it." ER.I at 020. This is simply incorrect. The Forest Service received the August 21st letter on August 21st (ER.III at 392). The letter sent by Plaintiffs' and received on August 27th was a different letter entirely, and was essentially a pre-litigation settlement offer by Plaintiffs (ER.III at 536-537)—a fact clearly acknowledged in the first sentence of the August 28th memo, addressed "[t]o" the "Administrative Record, by the Forest Service. ER.III at 538. Yet even had this been the case, the 2014 spotted owl surveys were conducted by the Forest Service itself, and the agency had the final results of these surveys in its possession well before the FEIS and ROD were released, thus there is no reasonable explanation for not disclosing the information to the public and preparing a site-specific impacts analysis utilizing

this relevant information.. ER.III at 391(Forest Service stating, on August 21st, 2014, that the information in Monica Bond's August 21st letter is "All based on info Forest Service provided to you. . ..").

Second, the district court relied upon a brief reference, in the Rim fire ROD, to the August 21st letter (ER.I at 020-21), but this single paragraph about the letter in the ROD also fails to divulge to the public the actual contents of the letter, or the fact that occupancy levels of spotted owl levels in the Rim fire—contrary to the message portrayed in the FEIS—are higher than in unburned old forest—even in areas with mostly high-intensity fire. Nor does this paragraph explain that substantial logging would occur in the occupied territories or the potential effects of this logging on the 70 resident owls, or the owl population as a whole. ER.IV at 635. Further, the passage from this paragraph quoted by the district court (ER.I at 020-21]) improperly suggests that the detailed analysis and results conveyed in the August 21st letter were "already addressed in the EIS", which is nowhere evidenced in the EIS. Of course the general public wouldn't actually know this because the Forest Service never tells the public what information the letter actually conveyed. *See also* Section III *infra* discussion of "underlying point" of August 21st letter. This paragraph in the ROD cannot and does not cure the Forest Service's failure to prepare an FEIS which conveys "all the information on environmental impacts and alternatives that the decisionmaker and the public need,

- 24 -

in order to make the decision and to ascertain that every significant factor has been examined". *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed.Reg. 18026 (Mar. 23, 1981).

Finally, the Court ruled that the Forest Service satisfied NEPA's hard look, and public disclosure requirements with the two-page memo addressed "[t]o" the "Administrative Record" on August 28, 2014. ER.III at 538-539;ER.I at 020. However, not only does this brief, post-decisional memo, not actually divulge the results of the 2014 spotted owl surveys, or discuss the fact that there is 92% occupancy of spotted owl territories in the Rim fire area, most of which are pairs, or the amount of logging planned within these occupied owl territories, it was never sent to Plaintiffs, much less released to the public. This memo to the administrative record, which refuses once again to disclose this relevant information to the public, cannot fix the analytical and disclosure deficiencies of the Rim Fire FEIS which have resulted from a failure to disclose and analyze this very information.

**B. The Forest Service Misrepresented Spotted Owl Studies and Consistently Minimized Adverse Impacts of Post-fire Logging on Spotted Owls in an Effort to Avoid a Full and Fair Discussion of the Impacts of the Rim Fire Logging Project on the California Spotted Owl.**

In the Rim fire FEIS, Defendants consistently misrepresented the key scientific studies regarding spotted owls, post-fire habitat, and post-fire logging,

and hid or minimized key conclusions about adverse impacts from the public, in violation of NEPA's hard look standard. For example, the FEIS characterized Clark et al. (2013) in the following way: "Clark et al. (2013) summarized the results provided by the few studies that have been conducted on spotted owls in burned landscapes and noted that results were equivocal." ER.III at 549. In reality, Clark et al. (2013) actually analyzed original, new data that the authors themselves gathered, clearly concluded that post-fire logging adversely affects spotted owl occupancy/populations, and recommended avoiding post-fire "salvage" logging within occupied spotted owl territories. ER.II at 233. The district court next relied upon a passage from the FEIS's Response to Comments which claimed that Clark et al. (2013) "did not explicitly test the effects of salvage logging" and "combined" post-fire logging "with high severity fire as a source of habitat loss…" ER.I at 019; ER.III at 579. Again a misrepresentation, because Clark et al. (2013) actually tested the effects of post-fire "salvage" logging both as an individual variable and in combination with different forest structure and fire intensities. ER.II at 215(Table 3). The authors also clearly concluded that post-fire salvage logging adversely affects spotted owls. ER.II at 223 ("Our results also indicated a negative impact of salvage logging on site occupancy by spotted owls. We recommend restricting salvage logging after fires on public lands within 2.2 km of spotted owl territories . . .to limit the negative impacts of salvage logging.").

Here, Defendants deliberately attempt to avoid the findings of this study in an effort to minimize the likely impacts of the Rim Fire Logging Project on the California spotted owl. This is impermissible under NEPA. *Blue Mountains v. Blackwood*, 161 F.3d 1280, 1212-16 (9th Cir. 1998).

With regard to Clark (2007), Defendants' FEIS once again misleadingly characterized the study, and minimized and omitted troublesome conclusions about adverse impacts of post-fire logging. Defendants' Rim fire FEIS stated the following about Clark (2007): "Clark (2007) found that while spotted owls did roost and forage within high severity burn areas, the use was very low. The results suggest that this cover type was *poor habitat* for spotted owls." ER.III at 549 (emphasis added). But, Clark (2007) specifically found that spotted owls preferentially *selected* dense, mature/old forest (Nesting, roosting, foraging habitat, or NRF: ER.II at 204-205) that experienced high-severity fire and was not subjected to post-fire logging ("NRF High")—*i.e.*, they used such areas at levels that substantially *exceeded* the availability of that habitat on the landscape. ER.II at 205(Figure 6.2). Defendants' FEIS failed to divulge this key finding, which indicates *preferred* habitat not "poor habitat", and was misleading in suggesting that overall numerically "low" use equates to poor habitat, for the simple reason that only a small portion of the study landscape was mature forest with unlogged high-severity fire (NRF High)—less than 5% of the total—but the owls went out of

- 27 -

their way to use such habitat (level of use was twice the level of availability) even though it was very rare on the landscape. *Id.* Moreover, the owls avoided post-fire logged areas (used them at levels below their availability). *Id.* In fact, Clark specifically found that, even where the owls were found within the boundaries of post-fire salvage logging units, this was generally only "prior to" post-fire logging in those units, or was in unlogged buffer zones (such as riparian zones) within the logging unit boundaries. ER.II at 206. The FEIS refused to divulge these key findings, once again minimizing the adverse impacts of post-fire logging in order to avoid a true analysis of the Rim Fire Project on the 70 resident spotted owls in the project area.

Further, the district court made a clearly erroneous finding of fact with regard to Clark (2007), stating that Figure 6.2 of this study "does not address the rate at which the owls choose highly burned areas over other habitats", providing no citation to any source in the record to support this statement. ER.I at 023. In fact, this statement is mathematically impossible, since both the "Available" and "Used" categories in Figure 6.2 of Clark (2007) each sum to 100%. ER.II at 205. In other words, when the "Used" level for any given category—such as NRF High—is higher than the "Available" level for that category, it is necessarily true that the owls are passing by other categories (*i.e.*, using other habitat types relatively less) in order to forage in the category in question. No other

interpretation is possible, mathematically, and the district court simply misunderstood this basic principle of the study. Moreover, the district court, like the FEIS, completely avoided discussion of the fact that Clark (2007) found that spotted owls avoided post-fire logged areas. ER.I at 022-23.

In relation to Bond et al. (2009), the Rim fire DEIS correctly acknowledged that this study found that spotted owls "preferentially select high-severity fire areas for foraging", due to the good small mammal prey base in such areas (ER.II at 117), consistent with the actual findings of this study. ER.II at 186 (for most owls, "strongest selection for foraging areas was in high-severity burned forest within1.5 km from the center of their foraging ranges."). However, the FEIS improperly minimized and inaccurately reported this key finding in the same location of text, instead representing that Bond et al. (2009) merely found that spotted owls "*may use* high-severity fire areas for foraging…" ER.III at 553-554 (emphasis added). Moreover, as with Clark et al. (2013), discussed *supra*, the FEIS omitted any mention of the core recommendation of Bond et al. (2009), based upon their findings: "We recommend that burned forests within 1.5 km of nests or roosts of California spotted owls not be salvage-logged…" ER.II at 187-188.

Finally, the district court's insistence that this is all just a "battle of the experts" and therefore deference must be given to the agency with regard to these studies, is misplaced. ER.I at 021-22. There can be no such "battle" when the

Forest Service's experts refuse to engage—*i.e.*, when the Forest Service's analysis documents simply refuse to discuss the adverse findings of the studies with regard to post-fire logging. Further, the passage from the Forest Service's unpublished report, Keane (2014), quoted by the district court, makes no sense as supposed evidence of a "battle", given that the quote *agrees* with *Plaintiffs'* position (*i.e.*, that spotted owls actively use post-fire habitat, including high-intensity fire areas). ER.I at 021.

> **C. The Forest Service did not provide a Meaningful Explanation to Support their Finding that the Logging of Thousands of Acres of California Spotted Owl Preferred Foraging Habitat within the Core Areas of 39 Occupied California Spotted Owl Territories "May Affect Individuals but Would not Lead to a Trend Towards listing", and thus Failed to take a Hard Look at the Impacts of this Project.**

Defendants' FEIS concluded that the Rim fire logging project may affect individual spotted owls but "is not likely to result in a trend toward Federal listing [under the Endangered Species Act, or ESA] or loss of viability…" ER.III at 563-564. However, the Forest Service has failed to articulate a rational connection between the facts and this determination. *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1011 (9th Cir. 2013). This is likely because, as discussed *supra*, rather than incorporate into their analysis the fact that 39 occupied spotted owl territories, containing approximately 70 spotted owls - or about 30% of the entire population on the Stanislaus National Forest—would have extensive post-fire logging within

their territories, including the removal of thousands of acres of preferred foraging habitat (mature forest that burns at high-severity) from these territory core areas, the Forest Service instead decided to base their determination that the Project is not likely to result in a trend toward listing on the fact that the Project is only logging areas which burned at high-severity. ER.III at 562-564. Given that Forest Service has acknowledged that owls preferentially select high-severity burn areas for foraging when it is in close proximity to their territory core areas, and the fact that salvage logging of these preferred foraging grounds within an occupied territory core area often causes a loss of occupancy or territory abandonment, basing the "may affect" determination on the fact that logging is only going to occur in high-severity burn areas does not represent a reasonable explanation, let alone a meaningful one. *Earth Island Institute II*, 442 F.3d at 1172-73; *Ecology Center v Austin*, 430 F.3d 1057, 1067 (9th Cir. 2005).

This is especially true given that these pages of the FEIS (ER.III at 562-564), which purport to have determined that no loss of viability is possible, fail to factor in the already precipitous decline of spotted owl populations in the central Sierra Nevada (see figure below) or the fact that because this is an Area of Concern for spotted owls, any impacts in this area will have "a disproportionate potential to affect the California spotted owl population". ER.IV at 685 and ER.II at 551.



Figure 2 from Tempel et al. (2014), showing an alarmingly steep declining trend in spotted owl population in the Forest Service's Central Sierra Nevada Study Area for spotted owls. See ER.II at 290.

Finally, the district court' insists that the holding in *Earth Island II*, has been met in this case, and that here the Forest Service has taken a hard look at the impacts of its Rim Fire Logging Project decision because in *Earth Island II* the Forest Service denied that high-intensity fire areas are suitable habitat for spotted owls while, in this case, the agency admits that such habitat is suitable. ER.I at 025. But in a circumstance where the end result is the same, the failure to actually assess the impacts associated with the removal of thousands of acres of foraging habitat within occupied owl territories, is there really a distinction which would evade application of *Earth Island II* in this case? The answer is quite clearly no.

The Forest Service's refusal to assess the impacts of the Rim Fire Logging

Project, including an evaluation of whether this Project will threaten the viability

of this sensitive species, in light of the site-specific facts and the scientific

evidence has resulted in a failure to meet the hard look requirement of NEPA.

## II.     THE FOREST SERVICE WAS REQUIRED TO PREPARE A SUPPLEMENTAL ENVIRONOMENTAL IMPACT STATEMENT TO FULLY CONSIDER THE IMPACTS OF THE RIM FIRE LOGGING PROJECT ON THE CALIFORNIA SPOTTED OWL

NEPA's implementing regulations, 40 C.F.R. § 1502.9(c), require agencies

to "prepare supplements to either draft or final environmental impact statements if

. . . there are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts."

Moreover, "the bar for whether significant effects may occur is a low standard."

*League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*,

752 F.3d 755, 760 (9th Cir. 2014)(internal quotation marks and citations omitted).

If the new circumstances or information "raise substantial questions regarding [the

project's] impact [that is] enough to require further analysis before allowing the

project to proceed." *Id.*

Here, significant new information which necessitates the preparation of a

Supplemental Environmental Impact Statement exists in the form of the 2014

California spotted owl survey data results, and the August 21, 2014 letter sent to

the Forest Service which contains interpretation and analysis of the survey data by

spotted owl biologist Monica Bond. ER.III at 395-404. The letter, submitted just 9

days after the survey information was provided to Plaintiffs (ER.III at 391), and

received by the Forest Service prior to the release of the Final Environmental

Impact Statement, provided a detailed scientific evaluation of the raw survey data

and determined that there exist 39 occupied California spotted owl territories

within the Rim Fire area one year after the fire (ER.III at 398); that these territories

are home to approximately 70 resident spotted owls (ER.III at 450-451); and,

utilizing methods adopted by other peer reviewed papers, and Forest Service

protocols, statistically determined that the level of occupancy for owl sites in Rim

Fire area is 92% (ER.III at 398-400), which is substantially higher than the typical

occupancy of owl sites in other areas where surveys have been conducted (67-76%

for unburned forest and 80% for other burn areas). ER.III at 400. Ms. Bond

attached to her letter a detailed spreadsheet which reduced to tabular form the 2014

survey locations, dates and results (ER.III at 407-424); an additional spreadsheet

which summarized the 2014 status and nesting information regarding each

territory, as well as the recent survey history and prior status of each territory

(ER.III at 450-451); and provided maps of the core of each owl territory (1.5km

surrounding the best known detection, roost or nest site) overlaid with the proposed

logging units from the Draft EIS. The underlying point of Ms. Bond's evaluation

was to demonstrate to the Forest Service, contrary to the assumptions in the Draft

Environmental Impact Statement (ER.II at 113-114) and consistent with the scientific literature on owls use of burned areas, that widespread and exceptional use of the Rim Fire area by California Spotted Owls was occurring, and that the location of logging units, when overlaid on the core areas of these owl territories demonstrates a disproportionately large impact on these territories and their resident owls which was not discussed in the Draft EIS.

It is Plaintiffs' contention that Defendants did not incorporate this significant new information into their analysis of potential impacts to the California Spotted Owl from the proposed logging, and thus violated NEPA and are therefore required to prepare a supplemental environmental impact statement before proceeding with logging within owl territory core areas. This contention is supported by the following: Defendants fail to disclose in their Final Environmental Impact Statement or Record of Decision that there are 39 occupied territories within the Rim Fire area; never tell the public where these territories are located on the landscape; never inform the public that a substantial amount of logging will take place in each territory core area; do not describe what the fate of these 70 owls will likely be because of this logging; do not address the current steep decline of spotted owls on national forest lands in the Sierras; and do not disclose the content of the August 21st letter from Monica Bond nor present a reasoned evaluation of its content.

The district court however, decided that Defendants were not required to supplement the Final Environmental Impact Statement because they "reviewed and understood the data in context before determining that the survey results were not significant new information." ER14 and repeated on ER15. Here the Court committed legal error.

> ". . .[I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance-or lack of significance-of the new information. A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation "of the relevant factors."

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861, 104 L. Ed. 2d 377 (1989).

An agency's decision not to supplement an EIS will be upheld if it was reasonable. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1024 (9th Cir. 1980). As further explained:

> When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures. Reasonableness depends on such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.

*Id.* Here, the information at issue: that approximately 70 spotted owls are residing in the Rim fire project area occupying 39 territories; where the 39 occupied territories exist on the landscape in relation to where the logging will take place; that loss of occupancy is likely from the intensity of logging which will take place in each territory core reducing the overall population in this Area of Concern where the population is already seen as low and the habitat already heavily fragmented; is environmentally significant as it goes to the heart of the impacts this project will have on the California spotted owl. This is especially true given the recently discovered deteriorating status of the California spotted owl (it is now know to have a declining population on managed lands (*e.g.*, ER.II at 290) and the fact that the logging proposed will be taking place in a spotted owl Area of Concern.

Next, the accuracy of the 2014 survey information is not in question, it was gathered by the Forest Service itself, and the Forest Service's response in their Record of Decision (ER.IV at 635) to the analysis presented in Monica Bond's August 21st letter never questions its substance or accuracy. The Forest Service does complain that the analysis of occupancy data contained in the letter was not peer reviewed, however the analysis of Forest Service gathered data was performed utilizing methods adopted by other peer reviewed papers and following Forest Service protocols. ER .II at 398-400.

This leads us next to the third and fourth reasonableness factors, "the degree of care with which the agency considered the information and evaluated its impact" and "the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data". Here, the agency devoted only one paragraph in its Record of Decision to the consideration of the extensive analysis presented in Monica Bond's August 21st letter. ER.IV at 635. This paragraph improperly characterizes and wrongly downplays the content of the August 21st letter by stating that the letter's "underlying point" was that the logging proposed "may affect spotted owls in the area", all while avoiding disclosing the actual contents of the letter, including failing to inform the public that approximately 70 spotted owls are residing in 39 territories within the Rim fire, and that the core of each of these territories will be substantially logged, likely leading to territory abandonment and contributing to the overall population decline of this species. *Id.compare with* ER.III at 395-535.

Aside from claiming that the EIS already addressed the adverse affects of the project on spotted owls, complaining that the letter was received so late (in reality only 9 days after the data was given to Plaintiffs), and reiterating their preapproved accelerated timeline, the Forest Service offers no "statement of explanation" for why the exceptionally high number of owls presently residing in the Rim fire area (as demonstrated by the survey data itself and Ms. Bond's August

21st letter), or the location of logging in relation to the location of the core of these occupied owl territories (information which is nowhere presented in the FEIS or ROD) has no significance with regard to the analysis of impacts this project will likely have on this Sensitive, declining species in this Area of Concern.  Here, having failed to meet any of the reasonableness factors the Forest Service has failed to establish that their decision to not prepare a supplemental environmental impact statement to consider this significant new information was in fact reasonable.

Finally, the district court, in searching for any evidence that the survey data was in fact incorporated into the decision, and thus would not qualify as significant new information, placed great weight on the fact  that the Record of Decision specifically mentions six protected activity centers which the Forest Service had to re-establish after improperly eliminating them from the spotted owl territory network (based upon the erroneous assumption that the fire effects would preclude occupancy). ER.I at 014 and 015.  While this demonstrates that the Forest Service utilized the survey data to comply with its own Forest Plan requirements pursuant to the National Forest Management Act 16 U.S.C. §1604(i), (ER .IV at 687(must establish a Protected Activity Center if an owl is found)),  it does not in any way demonstrate that the Forest Service analyzed the impacts that logging will have as to the 39 occupied owl territories that the 2014 survey data revealed exist.  Not

only does the Forest Service fail to mention anything about the other 33 occupied

territories (improperly leaving the public to assume that there are only six owl

territories with resident spotted owls in the entire project area[2]), the Forest Service

fails to analyze the impacts of logging to, *any* of the 39 occupied territories,

including the six occupied/re-established owl sites (such as how much logging will

be done in the area surrounding the six new PACs  and what impact that will likely

have on the long term persistence of  the owls residing in these six territories).

"When the public reviews an EIS to assess the environmental harms a project will

cause and weighs them against the benefits of that project, the public should not be

required to parse the agency's statements to determine how an area will be

impacted, and particularly to determine which portions of the agency's analysis

rely on accurate and up-to-date information, and which portions are no longer

relevant." *League of Wilderness Defenders*, 752 F.3d at 761.

The Ninth Circuit has also long held that under NEPA, site specific analysis

must occur before an agency irretrievably commits resources to a project.  *N.*

*Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975-78 (9th Cir. 2006).  Here

because the Forest Service failed to give careful consideration to site-specific

information that would have ensured a well informed decision and proper

---

[2] "Informed public participation in reviewing environmental impacts is essential to
the proper functioning of NEPA.  Without supplemental analysis of impacts  . . .

disclosure of potential impacts to a declining Sensitive species at the time they prepared their EIS, they are now required to prepare a supplemental EIS to assess this significant new information.

III.       **THE DISTRICT COURT ABUSED ITS' DISCRETION WHEN IT FAILED TO SUPPLEMENT THE ADMINISTRATIVE RECORD WITH THE DECLARATIONS OF MONICA BOND, DEREK LEE AND DOMINICK DELLASALLA, WHICH, THROUGH THE DISCUSSION OF COMPLEX AND TECHNICAL MATERIAL ILLUMINATE RELEVANT FACTORS THAT THE FOREST SERVICE FAILED TO CONSIDER IN APPROVING THE RIM FIRE PROJECT.**

"[A]gency action must be examined by scrutinizing the administrative record at the time the agency made its decision." *Asarco, Inc. v. U.S. Envt'l. Protection Agency*, 616 F.2d 1153, 1159 (9th Cir. 1980). However, the Ninth Circuit has recognized that:

> [I]t is both unrealistic and unwise to straitjacket the reviewing court with the administrative record. It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not. The court cannot adequately discharge its duty to engage in a substantial inquiry if it is required to take the agency's word that it considered all relevant matters.

*Id.*

Plaintiffs moved the district Court to supplement the administrative record with three declarations from scientists with expertise in the relationship between

---

the public would be at risk of proceeding on mistaken assumptions." *League of Wilderness Defenders*, 752 F.3d at 761.

spotted owls and fire. ER.IV at 867 (Dkt. 32). Contrary to the District Court's findings (ER.I at 9) these declarations were not submitted to challenge the correctness of the Forest Service's decision to log tens of thousands of acres in the Rim Fire Project, but rather they were submitted to show that in making that decision the Forest Service did not take into consideration all of the relevant factors, and thus did not ultimately support its decision. The goal being not to have the Court substitute its judgment for that of the agency, but for the Court to remand the decision to the agency for further analysis which will provide a reasoned evaluation of <u>all</u> relevant factors and a non-arbitrary assessment of the impacts of the project on the California spotted owl.

In order to illuminate the relevant factors that were not considered by the agency, it was necessary for the declarants to discuss and explain the complex and technical matters surrounding California spotted owl habitat needs as well as the specific findings of scientific studies. For example, in ¶¶7-13 (ER.IV 745-758) of the Declaration of Monica Bond ("Bond Declaration", or "Bond Decl."), Monica Bond, who is one of the top scientific experts on the relationship between spotted owls and post-fire habitat and a pioneer in researching this topic (*see, e.g.*, ER.IV at 746( ¶¶2-3), provides the court with an explanation of highly technical and complex material regarding spotted owls and fire, including: a) the fact that the 300-acre Protected Activity Centers (PACs), administratively designated by the

Forest Service around the very center of spotted owl nest/roost locations, are only a small fraction of the territories that spotted owls need to survive; b) the fact that the core area of a spotted owl's territory is the area within a 1.5-kilometer radius around owl nest/roost locations (equating to about 1,745 acres), which consists not only of the nest/roost location, but also primarily of the foraging/hunting habitat that the owls need in order to have enough food (small mammals) to survive and reproduce; c) the fact that the preferred foraging/hunting habitat for spotted owls is patches of high-intensity fire occurring in mature conifer forest, because the small mammal prey base is outstanding in this habitat; and d) the fact that the owls will "starve to death" if their preferred foraging/hunting habitat within 1.5 kilometers is removed by logging. ER.IV 745-758

The Declaration of Derek Lee (hereafter "Lee Declaration" or "Lee Decl."), who is also one of the world's top experts on spotted owls and fire (ER.IV at 760-761 (¶¶2-3), provided the court with a technical explanation as to why an analysis of impacts to an owl's 300-acre PAC is insufficient to determine the impacts of post-fire logging to spotted owls and why simply prohibiting logging within a ¼-mile zone around the nest/roost site (approximately 125 acres) during nesting season, while allowing such logging to occur in this area after nesting season, does not mitigate the actual impacts to the owl and its habitat from the logging. ER.IV at 761-764.

This highly technical background information illuminates for the Court that the Forest Service excluded several relevant factors when it concluded that the logging proposed "may affect individual [spotted owls] but is not likely to result in a trend toward listing". Specifically the Forest Service did not consider the amount of preferred foraging habitat (high severity burn areas) that would be lost through logging within the 1,745 acre core (1.5 km area surrounding nest/roost/detection site) of occupied owl territories. ER.III at 459. Without the benefit of the testimony in these declarations (as they were excluded), the district court, for example, erroneously relied on Table 3.15-3 of the Rim fire FEIS (ER.III at 459 [AR B00459]) even though the factors considered in that Table do not encompass the totality of the impacts to this species and therefore cannot support a finding that the Project will not lead to a trend toward ESA listing of the owl. ER.I at 26.

Similarly, ¶18b and ¶18d of the Bond Declaration (ER.IV at 753, 755) provide essential technical explanation of the Clark (2007) and Clark et al. (2013) studies, including: a) a technical explanation as to why, regarding Clark (2007), the FEIS's statement that high-severity fire areas are poor quality habitat for the owls is arbitrary, and explaining the key wildlife ecology measure of use of an area relative to its availability, what it means and why it is important; as well as explaining b) that Clark et al. (2013) *did* in fact find and conclude that post-fire logging significantly contributes to a loss of spotted owl occupancy and therefore

recommended that salvage logging not occur within 2.2 km of owl sites. This explaining of complex and technical information is necessary in order to illuminate the relevant factors which were not considered by the agency.

Contrary to the District Court's clearly erroneous assertion (ER.I at 008), the Bond and Lee Declarations did in fact identify information that the Forest Service entirely failed to consider. Paragraph 15 of the Bond Declaration (ER.IV at 750) includes original analysis prepared by Ms. Bond comparing the quantitative amount of post-fire logging (16% of an owl territory, on average) that was found to significantly reduce spotted owl occupancy in Clark (2007), with the amount of post-fire logging that would occur within the occupied owl territories in the Rim fire (based upon the 2014 owl survey data), identifying 17 occupied territories that would lose 21-50% of their foraging habitat, and 8 occupied territories that would lose over 50%. *Id.* Similarly, the Lee Declaration, ¶¶9-11 (ER.IV at 762-763), quantifies the impacts of the Rim fire logging project on spotted owl territories found to be occupied after the fire in 2014, and concluded that 32 of the territories would have 16% or more of their habitat removed, and that this would likely lead to territory abandonment and a substantial further reduction in the owl population. This central information exists nowhere in the record, and thus meets the exception for relevant factors that were not considered by the agency in making their decision, even though they had all the information necessary to do so.

- 45 -

Finally, the Declaration of Dominick DellaSala, another expert on spotted owls and fire ER.IV at766 (DellaSala Dec., ¶1), provided the district court with an essential technical explanation of the qualitative and quantitative (in terms of the number of owl territories affected) analysis provided in DellaSala et al. (2010), concluding specifically that: a) all of the spotted owl territories that lost occupancy after the Moonlight fire of 2007 in the Sierra Nevada had extensive post-fire logging occur within a 1.5-kilometer radius of the nest/roost location just prior to the loss of occupancy (ER.IV at 767(¶4&5); and b) these territories in the Moonlight fire were *in addition to* the ones that all lost occupancy after post-fire logging which were described in Lee et al. (2012) (*Id.*), thus creating a much larger sample size for evaluating the effects of post-fire logging on owl occupancy. Both are relevant factors that the Forest Service failed to consider when it improperly dismissed consideration of the content of DellaSalla et al. (2010).[3] Had the district court not excluded this declaration, the court would have understood that the Forest Service had no basis for its statement that DellaSalla et al. (2010) "did not include analysis or qualitative evidence that could be used in the project analysis". ER.I at 020.

---

[3] Dismissal from consideration of the content of DellaSalla et al. (2010) because it was not a peer-reviewed publication was also not proper under the law. *Earth Island II*, 442 F.3d at 1172-73 ("The FEISs cannot assume that simply because the owl habitat studies are preliminary, the adverse impacts discussed therein will not occur.").

The testimony provided in Plaintiffs proffered declarations is fully consistent with the narrow exceptions to the record review rule, and are proper here to expose the "stubborn problems or serious criticism" which the Forest Service has attempted to "swe[ep] under the rug". *National Audubon Society v. United States Forest Service*, 46 F.3d 1437, 1447 (9th Cir. 1993). The district court abused its discretion when it excluded them from consideration.

**VI.  REMOVAL OF THOUSANDS OF ACRES OF PREFERRED FORAGING HABITAT FOR THE CALIFORNIA SPOTTED OWL, A FOREST SERVICE SENSITIVE SPECIES WITH A DECLINING POPULATION, IN A GEOGRAPHIC LOCATION DESIGNATED AS AN AREA OF CONCERN FOR THIS SPECIES, WILL LIKELY RESULT IN IRREPARABLE HARM TO PLAINTIFFS AND THE ENVIRONMENT, INCLUDING THE 70 OWLS RESIDING IN THIS AREA.**

An injury is "irreparable" where it cannot be adequately remedied by money damages or other legal remedies, and where such injury is "permanent or at least of long duration." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Such harm is likely if it is not speculative or remote. *Cottrell*, 632 F.3d at 1053 (logging that would harm "ability to 'view, experience, and utilize'" project area constitutes irreparable injury, even if some portion of the forest will remain after the logging).

First, the post-fire logging approved by the Rim Fire Project, which includes the nearly wholesale removal of dead trees in areas created by high intensity fire, is the most ecologically damaging activity which can take place after a fire. ER.II at 76-103.

The initial implementation of the Rim fire logging project—*i.e.*, the implementation relevant to Plaintiffs' request for preliminary injunction here - include the NeverGreen, Triple A and DoubleFork timber sales, which unnecessarily target logging in occupied California spotted owl territories (*see, e.g.*, ER.IV at 772-773 Exhibit A to Bradley Dec.), ER.IV at 822-826(Exhibit D to Augustine Dec.). Removing thousands of acres of preferred foraging habitat adjacent to the territory core (within 1.5km) which is habitat essential to owls. The leading scientists on the relationship between California spotted owls, fire, and post-fire logging submitted comments and declarations concluding that, if the Rim Project is allowed to proceed within the 39 occupied California spotted owl territories (within 1.5 km of the territory cores), it will cause severe adverse impacts, including territory abandonment, starvation and death, and will exacerbate the ongoing population decline in this Area of Concern, which is likely to necessitate the listing of this species as threatened or endangered. *See e.g*., ER.IV at 745-758 (¶¶1-22); ER.IV at 759-764 (Lee Dec., ¶¶1-14); *see also* ER.IV at 765-768 (DellaSala Dec. ¶3-6). These harms which will likely befall the resident 70 California Spotted Owls cannot be remedied by money damages and are long lasting or in the case of death permanent.

Moreover, the implementation of the Rim fire logging project would irreparably harm the interests of Plaintiffs' members, by eliminating, on the acres that would be logged, the reasons that they seek out, and spend time in, unmanaged

post-fire habitat, including scenic beauty, wildlife viewing, including searching for California Spotted Owls, spiritual rejuvenation, recreation, and scientific research opportunities. ER.IV at 716-719 (Declaration of Victoria Carpenter); ER.IV at 695-701(Declaration of Doug Bevington); ER.IV at 706-708 (Declaration of Richard Halsey); ER.IV at 702-705 (Declaration of Brian Nowicki); and ER.IV at 709-715 (Declaration of Chad Hanson). In fact, harm to Plaintiffs' members from the logging of these acres would also extend beyond the boundaries of the logging units themselves. ER.IV at 718(Carpenter Dec.) at ¶7 (destroying the aesthetic beauty of the area, making her not want to return); ER.IV at 703-705 (Nowicki Dec.) at ¶¶5&10 (adversely affecting the overall conservation of the California Spotted Owl, reducing populations and making it even more rare and harder to find, contemplate and enjoy); ER.IV at 6 98(Bevington Dec.) at ¶12 (witnessing the devastation from logging while driving through the area will continually diminish enjoyment of the areas that have not been logged).

These harms outlined above—to both the Plaintiffs' members, the environment and the wildlife that currently inhabit this burned forest ecosystem which is proposed for logging—are both imminent and likely because logging on the initial timber sales is ongoing and habitat is currently being lost. As described herein, these are exactly the type of harms the Ninth Circuit has found to be irreparable in the preliminary injunction context. *See, e.g.*, *Cottrell*, 632 F.3d at 1053; *Earth*

*Island II,* 442 F. 3d at 1169-73 (logging of several thousand acres of post-fire California spotted owl habitat constitutes irreparable harm). These harms cannot be remedied by money damages, and once the trees are cut, they will not be replaced on the landscape, as the habitat they now represent, in the lifetime of Plaintiffs' members. *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755, 764, (9th Circuit 2014). The harm from the Rim fire project logging proposed in occupied California spotted owl territories is irreparable for the purposes of preliminary injunction analysis

## V. GIVEN PLAINTIFFS' REQUEST FOR A TAILORED INJUNCTION WHICH WOULD ALLOW MORE THAN HALF OF THE APPROVED LOGGING TO PROCEED THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF ISSUANCE OF AN INJUNCTION IN THIS CASE.

In contrast with the likely irreparable harm to Plaintiffs and their members and to California spotted owls and their preferred foraging habitat, there will be no significant irreparable harm to the Forest Service from issuance of a preliminary injunction. "[I]f environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Sierra Club*, 510 F.3d at 1033 (quoting *Amoco Prod. Co.*, 480 U.S. 531, 545 (1987)); *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1299 (9th Cir. 2003). Here, logging has been ongoing since late September, 2014 and, once the trees

have been cut down, Plaintiffs' harm, and the harm to wildlife, is realized. The main hardship the Forest Service may claim is that their revenue will be reduced somewhat if Plaintiffs' request is granted, but the "loss of anticipated revenues … does not outweigh the potential irreparable damage to the environment." *Earth Island II*, 442 F.3d at 1177.

Plaintiffs' requested relief pertains solely to occupied California spotted owl territories, and would affect only about 40% of the planned logging. *See, e.g.,* ER.IV at 772-773(Bradley Dec., Exhibit A ). Plaintiffs asked Defendants to conduct logging and associated activities within the approximately 60% of the Rim Project that does not intersect with the 1.5 km spotted owl territory zones (ER.III at 395-404; ER.III at 536-537) prior to the issuance of the Decision in this case, and reiterated this request—at least with regard to the preliminary injunction stage—after Plaintiffs filed their Complaint, but Defendants chose instead to heavily prioritize logging of occupied spotted owl territories. *See* ER.IV at 772-773 and ER.IV at 822-826.

In addition, the Forest Service fully recognizes that the timber will remain economically viable next year and is staging the logging operations to keep pace with the lumber mill's capacity. ER.IV at 615-617. Thus, any loss from the deterioration of wood in occupied spotted owl territories would be no more or no less than the deterioration of wood which is occurring in those areas outside of

occupied owl sites which the Forest Service has voluntarily chosen not to log at this time.  As recently discussed by the Ninth Circuit, economic loss during the pendency of an injunction does not represent a complete and total loss, akin to the loss of habitat, but rather a delay and potentially a reduction in revenue. *League of Wilderness Defenders*, 752 F.3d at 764-68.  Here, as in *League of Wilderness Defenders*, the likely irreparable injury to California spotted owls, and to Plaintiffs' use and enjoyment of that habitat, outweighs the economic interests of the Forest Service, and private logging companies. *Id.*  This is especially true in this case because even an injunction would not impede the implementation of *most* of the project.  In fact, there are **over 8,000 acres** proposed for salvage logging or roadside hazard tree removal approved under the Record of Decision (*see* ER.IV at 851-855)**, with an <u>additional</u> 4,535 acres of deer emphasis cutting and fuels treatments,** none of which intersects with any of the occupied owl territories and thus are not the subject of this requested injunction.  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) ("When deciding whether to issue a narrowly tailored injunction, the [court] must assess the harms pertaining to injunctive relief in the context of that narrow injunction.").

Moreover, the relevant timeframe for assessment of balancing interests is the timeframe that a preliminary injunction would be in place. *League of Wilderness Defenders*, 752 F.3d at 765 ("Under *Sierra Forest,* we must consider

only the portion of the harm that would occur while the preliminary injunction is in place, and proportionally diminish total harms to reflect only the time when a preliminary injunction would be in place."). Since the logging contracts issued for the Nevergreen, Triple A and DoubleFork timber sales run through 2016/2017 and the Record of Decision specifically indicates that the peak of logging would occur in 2015(ER.IV at 615, 617), if a preliminary injunction is granted, any planned logging could be conduct next year, or sometime thereafter.

Further, threats to public safety during the timeframe of a preliminary injunction are minimal for three reasons. First, the area is closed to the public, and has been for over year (http://www.fs.usda.gov/alerts/stanislaus/alerts-notices/?aid=20774). Second, roadside logging on the main public roads (maintenance level 3, 4, and 5) was subject to a previous NEPA decision issued in April and has consequently largely been completed (ER.III at 565) and is not the subject of this injunction request. And, third, the vast majority of roadside logging remaining is on Level 2 roads ("Roads open for use by high clearance vehicles", ER.III at 566), or on Level 1 Roads (that are actually considered closed by the Forest Service. *Id.* In fact, most of the Hazard Tree logging authorized by the Rim Fire Logging Project is not being prioritized by the Forest Service (*see* ER.IV at 772-773), and aside from imminent hazards in logging areas, purchasers may opt to remove them or not. In addition, only the portions of these roads

(many of which are dead-end logging roads) which transect occupied spotted owl territories (for the sole purpose of accessing logging units within those territories) would be the subject of this requested injunction, leaving the vast majority of these roads to be logged should the purchaser so choose, or should the Forest Service put such contracts out to bid. Therefore, there is no genuine "hazard" tree risk, particularly during the limited duration which any preliminary injunction would be in place.

In addition, there is no risk of "future fire" during the brief pendency of a preliminary injunction (ER.III at 546 [Table 3.05-8]; compare ER.III at 544 [Table 3.05-7]: low fire potential in both action alternatives and no action in less than 5 years post-fire). In fact, all scientific studies which have evaluated whether post-fire logging reduces future fire severity have found that it does not – contrary to Defendants' theoretical modeling for this project. ER.II at 63.

For the foregoing reasons, the balance of harms and the public interest strongly favor of the tailored injunction requested herein.

//

//

//

**VI.      NO BOND, OR ONLY A NOMINAL BOND NOT TO EXCEED $1000, SHOULD BE REQUIRED TO SECURE INJUNCTIVE RELIEF IN THIS CASE BECAUSE THE EVIDENCE SUBMITTED BY PLAINTIFFS ESTABLISHES THAT POSTING A SUBSTANTIAL BOND WOULD CREATE AN UNDUE HARDSHIP, WOULD THWART THEIR ABILITY TO OBTAIN MEANINGFUL RELIEF IN THIS CASE AND WOULD HAVE A CHILLING EFFECT ON THEIR ABILITY TO ENFORCE ENVIRONMENTAL LAWS IN THE FUTURE.**

It is well established in the Ninth Circuit that, pursuant to Fed. Rule of Civ. Pro. 65(c), Federal courts have discretion as to the amount of security to require for issuance of a preliminary injunction and may even dispense with the security requirement altogether. *See Johnson v. Couturier,* 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*.'" (quoting *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir.2003)).

In addition, the Ninth Circuit recognizes a public interest exception to the imposition of a substantial bond in order to ensure that the mechanisms established by Congress for private enforcement are not frustrated. *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,* 766 F.2d 1319, 1325-26 (9th Cir. 1985); *Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).

In fact, the only situations wherein a substantial bond has been deemed appropriate in an environmental enforcement action is when the Plaintiff fails to submit <u>any</u> evidence that they either cannot afford to post a substantial bond (*Save Our Sonoran, Inc. v.*

*Flowers*, 408 F.3d 1113 (9th Cir. 2005)) or that the posting of a substantial bond would create an undue hardship. *Habitat Educ. Ctr. v. U.S. Forest Service*, 607 F.3d 453, 458 (7th Cir. 2010) (Plaintiff Habitat Education Center never submitted evidence that a substantial bond would be a hardship, and actually admitted that posting the $10,000 bond had caused it no hardship.)

As has been established by the Declarations submitted by Plaintiffs in this case, neither Earth Island Institute, Center for Biological Diversity, nor California Chaparral Institute could afford to post a substantial bond in this case to secure an injunction. *See generally* ER.IV at 838-845 (Corrected Declaration of David Phillips); ER.IV at 720-723 (Declaration of Michael Sowle with Exhibits); ER.IV at 736-739 (Declaration of Kieran Suckling with Exhibits); ER.IV at 712-715(Declaration of Chad Hanson Dec. ¶¶9-18); and ER.IV at 708 (Declaration of Richard Halsey Dec. ¶5).   Not only would imposition of a substantial bond thwart their ability to secure meaningful relief in this case, it would also, have a chilling effect on their ability to pursue litigation to enforce environmental laws in the future. *Id*.

## CONCLUSION

Due to the significant errors of the law applicable to Earth Island's claims and the consistently erroneous findings of fact throughout the district court's denial of Earth Island's application for preliminary injunction, Earth Island requests that the district court be reversed, that an injunction pending appeal issue immediately

and that this case be remanded for issuance of an injunction which will preserve the status quo while the merits of the case are adjudicated.

Dated:  November 5, 2014                    Respectfully submitted,


                                            s/Rachel M. Fazio____
                                            RACHEL M. FAZIO
                                            P.O. Box 897
                                            Big Bear City, CA 92314


                                            s/ Justin Augustine (with permission)
                                            JUSTIN AUGUSTINE

                                            Attorneys for Center for Biological
                                            Diversity, Earth Island Institute and
                                            California Chaparral Institute


## STATEMENT OF RELATED CASES

No other cases currently before the Ninth Circuit Court of Appeals are related to this case.

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Circuit Rule 32(a)(7)(c), the attached motion is

proportionately spaced, has a typeface of 14 points, and contains 13,409 words.


  _s/ Rachel M. Fazio
Rachel M. Fazio
Counsel for Plaintiff-Appellants

**PROOF OF SERVICE**

I hereby certify that on November 5, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/___Rachel M. Fazio_____